FILED

12/23/2025

Clerk of the
Appellate Courts

IN THE COURT OF CRIMINAL APPEALS OF TENNESSEE
AT KNOXVILLE
Assigned on Briefs November 18, 2025

**STATE OF TENNESSEE v. RIKIYA JOY PARKS**

**Appeal from the Criminal Court for Hawkins County**
**No. CC-22-CR-114 Alex Pearson, Judge[1]**

_____

**No. E2024-01911-CCA-R3-CD**
_____

Defendant, Rikiya Joy Parks, appeals her Hawkins County Criminal Court jury convictions for aggravated child neglect, making a false report, and child abuse, challenging the admission of photographs of the minor victim, the admission of what she claims was improper character evidence, the exclusion of printed screenshots of Facebook messages, the sufficiency of the convicting evidence, and the imposition of consecutive sentences. Following our review, we affirm.

**Tenn. R. App. P. 3 Appeal as of Right; Judgments of the Criminal Court Affirmed**

MATTHEW J. WILSON, J., delivered the opinion of the court, in which ROBERT W. WEDEMEYER, P.J., and CAMILLE R. MCMULLEN, J., joined.

Ethel P. Rhodes, Morristown, Tennessee (on appeal); and Randall Crossing, Jefferson City, Tennessee (at trial), for the appellant, Rikiya Joy Parks.

Jonathan Skrmetti, Attorney General and Reporter; Benjamin L. Barker, Assistant Attorney General; Dan E. Armstrong, District Attorney General; and Joanie Stallard Stewart, Assistant District Attorney General, for the appellee, State of Tennessee.

**OPINION**

Defendant's convictions arose from the abuse and neglect of K.R. ("the victim"), the sixteen-year-old daughter of Defendant's boyfriend, whom police officers found

---

[1] By interchange.

concealed beneath a bed in the family trailer. [2] She was emaciated, filthy, and covered in bruises.

## Factual and Procedural Background

The Hawkins County Grand Jury charged Defendant via a three-count presentment with one count of aggravated child neglect (Count One), one count of making a false report (Count Two), and one count of child abuse (Count Three) for her treatment of the victim and her attempt to conceal the victim from authorities.

## I. Motion Hearing

Prior to trial, Defendant moved the trial court to exclude photographs taken of the victim at the hospital following her removal from Defendant's care, arguing under Tennessee Rule of Evidence 403 that the photographs were more prejudicial than probative. In its response, the State argued that the photographs were relevant to show the victim's condition at the time she was discovered by law enforcement officers and to assist in the testimony of Doctor Andrew Wilt and nutritionist Ashley Kiser, both of whom treated the victim during her hospital stay. Defendant also moved the trial court to admit eight pages of printed screenshots of messages purporting to be Facebook messages exchanged between Defendant and the victim. The State argued that the messages were inadmissible because they could not be authenticated.

### *A. Photographs*

At the April 2024 hearing on Defendant's motion, Doctor Wilt testified as an expert in pediatric medicine that he cared for the victim while she was hospitalized at Niswonger Children's Hospital from May 18 to 24, 2021. The doctor testified that the photographs offered by the State depicted the victim as she appeared when she arrived at the hospital. He diagnosed the victim "with severe malnourishment due to neglect in the home environment," noting that her weight placed her body mass index in less than the first percentile for other girls her age. He recalled that the victim "manifested evidence of a dangerous syndrome" called the refeeding syndrome, which, he said could be traced to concentration camp prisoners who died after being "refed and . . . provided nourishment in an unmonitored setting," as well as "hypophosphatemia." He explained that in cases of severe malnourishment like the victim's, the body becomes "unable to generate a primary energy component called adenosine triphosphate or ATP," which could "ultimately" cause "heart failure" and death. He said that the danger of refeeding syndrome was "one of the primary purposes of her hospitalization." The doctor testified that the photographs were

---

[2] We do not refer to the victim or her father by name to protect the anonymity of the victim, who was a minor at the time of the offenses.

"reflective of what we witnessed at the time of her admission" and "representative of injuries . . . or abuse that she was describing."

Doctor Wilt said that the photographs of the victim's hands, legs, knees, and ankles—numbered 1 through 5—were not "need[ed] per se" for his testimony. Photographs of the victim's back and shoulders—numbered 6 through 9—depicted "bruising across her paraspinal and vertebral area," which the doctor described as "a very uncommon area to injure . . . on a routine basis." The doctor said that photograph numbers 6 through 9 were important images because they verified the information that was in the victim's medical records and provided a physical depiction to go alongside his testimony. Photographs of the victim's face—numbered 11 through 13—showed the bruising on both sides of her face, her forehead, and her eye, as well as a "subconjunctival hemorrhage" of her left eye. Photograph number 14 depicted the victim's clavicle area, which was important to the doctor's finding of a lack of breast tissue, which verified long-term deprivation of nutrition. Photographs 15 and 16 were of the victim's lower back and buttocks and showed the wasting of the fat and muscle in that area. While the doctor said that although photograph number 17 of the victim's legs was not particularly relevant, photograph number 18 had "value in that you can see the wasted appearance of her upper arms." He said that the photographs related to his ultimate diagnosis and to his testimony at trial. Of the photographs he stated were necessary to his testimony, he acknowledged that some depicted the same area of the victim's body but explained that the different angles of the photographs made different injuries more or less apparent. He opined that it would "be helpful" for the jury "to look at all of the pictures" to see "the degree of wasting."

The trial court deemed that photographs 6 through 9, 11 through 13, 15, 16, and 18 were admissible, concluding that there was nothing so graphic in any of the photographs to render them unduly prejudicial under Rule 403. The trial court issued a written order incorporating its oral findings by reference.

*B. Facebook Messages*

At the same hearing, Defendant testified that she had a Facebook account linked to her telephone number that she used to communicate with others. Defendant initially said she and the victim's father created two accounts for the victim, one when the family lived in Florida and another when they moved to Tennessee. Defendant said she supervised the victim's second account the "[m]ajority of the time." Defendant testified that she communicated with the victim via Facebook Messenger and identified printed messages that she said accurately reflected a conversation she had with the victim. The State reserved the right to object to the messages on authentication grounds but agreed that, for the purposes of the hearing, the messages could be entered into evidence and exhibited to Defendant's testimony.

In a message allegedly sent from the victim's account around the time that police first arrived at the home where the victim lived with Defendant to perform a wellness check, the victim apologized to Defendant "for everything I have done." The victim said she was "screwed up" because her "genes" made her "crazy," and insisted that she did not "want to leave" Defendant's home. In another message that Defendant identified as coming from the victim's account, the victim threatened to "lie and blame" Defendant if the police returned, adding, "You will go to jail. I look bad enough that they will believe me and it's my word against yours. You have no proof I did this. . . . Do not let them take me please."

During cross-examination by one of her co-defendant's attorneys,[3] Defendant clarified that she helped the victim set up only the first account and claimed that she did not learn about the victim's second account until sometime in 2019 when the victim's former preschool teacher told them about the account.

During cross-examination by the State, Defendant identified an email she sent to her attorney providing the email account and username that would have been associated with Defendant's Facebook account. Defendant claimed that she "lost access to" that account in November 2021 and that she contacted Facebook for troubleshooting but could not retrieve her account. Defendant said she used both her cell phone and the family's laptop to access her account. Defendant said she posted regularly to Facebook "for like a diary and stuff to vent," including venting about the situation with the victim.

Defendant acknowledged setting up a new Facebook account for herself near the end of 2021. She also acknowledged that she had a third Facebook account that she used "when I was doing my adult on-line stuff." She insisted that she used that account solely for "on-line adult stuff until I switched over to family." She said the telephone number associated with the account that she lost access to was for a single cell phone that she shared with co-defendant Aaron Perkins.

Defendant said that she and the victim's father set up the original Facebook account for the victim and that they kept the password written on a sheet of paper. Defendant acknowledged that, at the behest of her first attorney, she attempted to log into the victim's account after the victim was taken from the home, and Defendant learned that the password had been changed. Defendant admitted that the victim was in state custody when they attempted to log into the victim's account without the victim's knowledge or permission. Defendant testified that she last successfully accessed the victim's Facebook account while

---

[3] Initially, Defendant was set to be tried jointly with the victim's father and Aaron Perkins, Defendant's ex-boyfriend, for the offenses against the victim. The trial court granted the motion to sever defendants but held a joint hearing on the admissibility of the Facebook messages and the photographs of the victim.

switching over the victim's devices approximately one week before the victim was discovered by law enforcement and removed from the home.

Defendant claimed that the victim's biological mother provided the victim with a cell phone in 2016 and that the victim "blocked" her mother on Facebook after her mother "threatened her life over cooking bacon." None of the screenshots exhibited to the hearing appeared to contain messages between the victim and her mother. Defendant and the victim's father did not take the cell phone but continued to monitor the victim's communications. Defendant claimed that she took the screenshots of messages on the victim's Facebook account "the weekend before everything happened or maybe a week before" and that the victim knew that she had accessed the victim's account and taken the screenshots. Defendant testified that although the victim had access to her Facebook account using multiple devices "over the years," the cell phone and tablet the victim had been using "disappeared the day [the victim] ran when all this happened." Defendant claimed that the victim told her that "she got rid of them."

Defendant agreed that she had provided several messages wherein the victim said that "she was making all of this up." Defendant acknowledged that, according to the time stamp on the messages, the conversation she had with the victim began at 7:42 p.m. on May 17, 2021, around the time that police had come to the residence to perform a wellness check on the victim. Defendant claimed that she messaged the victim from her cell phone while she was in her bedroom and that the victim messaged her from an unknown device from the victim's bedroom. Defendant said that she did not mention those messages to the police when they came to the house. Defendant claimed that although officers gave her the opportunity to provide a written statement about the case, she was not "allowed to go into full detail." However, Defendant agreed that the police did not prevent her from telling them about the messages. Defendant also claimed that she provided the messages to the first two attorneys appointed to her case.

Defendant said that she printed the screenshots immediately after taking them on her cell phone and that the device she used to take the screenshots was the same device she used to access the victim's Facebook account. Defendant then claimed that she originally saved the screenshots on her phone but that she lost access to the originals when she got rid of the cell phone. Defendant insisted that although she possessed the screenshots of the messages at the time of the juvenile court proceedings related to this case, she did not produce them because "we were told to hold that off" until her criminal proceedings commenced. Defendant reiterated that she did not use the evidence, which would have exonerated her if true, during the juvenile court proceedings where she ultimately lost custody of her own children. Defendant said she did not provide copies of the screenshots to a guardian ad litem involved in the juvenile proceedings.

Defendant admitted that she told her attorney that "some of the times may not match the actual device screenshot" in the top corners of the screenshots, explaining:

So if you look up at the top of the left corner where it says like -- like on the first page 4:48, that's what I was referring . . . to because when [the victim] and I and Aaron [Perkins] and [the victim's father] were all talking, when I printed everything out of it and we were actually going through the whole conversation and talked to [the victim] about it like in hand so she couldn't delete anything or be like no, it wasn't there, I noticed some of the conversation pages were missing, so that's when I got the device again, logged back into it with [the victim] sitting next to me. We reprinted what was missing and then we actually had went over a lot of the stuff, but not the . . . May 17th because that was like two or three days after I got out of jail, but all the other stuff, yes. And I thought we were trying a game plan to get [the victim] help.

Defendant conceded that she logged into the victim's account rather than her own after being released from jail but claimed that was "the only time" the victim "wasn't present when I got into it." Defendant said that she did not know what the victim took with her when she was removed from the home by the police.

The State showed Defendant a printout of a Facebook page that belonged to the victim, but Defendant insisted that "that's not her original one" and said that the victim had the same profile picture "on both of her accounts." Defendant identified a man in one of the pictures as a man who "was actually stalking my work."

Defendant admitted that she had been previously convicted of grand theft, larceny, and fraud, saying, "I took two charges for Aaron." She insisted that she did not commit the prior offenses and that "Aaron will even testify [to] it."

The victim testified that she had had three Facebook accounts, one when she was younger that she accessed from an iPad, a second one that Defendant made for her at the end of her eighth-grade year or the beginning of her freshman year, and a third that was the account she was using at the time of the hearing. The victim said she only used the account created for her by Defendant once. She did not know whether that account had been deactivated or deleted. The victim said she granted the State consent to search all her social media accounts, including her Facebook accounts. The victim denied using Facebook Messenger to communicate with Defendant, Mr. Perkins, or her father. Upon examining the printed screenshots of messages provided by Defendant, the victim said she did not recognize any of the messages and denied having had any such conversations with Defendant. The victim agreed that she did not communicate with Defendant "on any type of messenger" the day that she was taken from the home.

The victim denied using Facebook Messenger or any other social media account to communicate with her biological mother. The victim did not recall a time when her biological mother attempted to contact her via Facebook Messenger. She testified that she had not communicated with her biological mother at all since before the family moved to Tennessee when the victim was in seventh or eighth grade.

During cross-examination, the victim said she had never used the Facebook account created for her by Defendant to communicate with anyone. She reiterated that she used that "account once for maybe ten minutes and I was not allowed to hold the phone." The victim said she did not take any electronic devices with her when she was taken from the family home on May 17, 2021. She had no recollection of having testified at a hearing in juvenile court that she had a device with her when she left.

Hawkins County Sheriff's Office ("HCSO") Detective Keith Long testified that he obtained a judicial subpoena for all accounts that were associated with a particular phone number and that he uploaded the subpoena to the "Facebook law enforcement portal." Facebook returned information that that number was associated with an account listed under the name Aaron Andrew, which Facebook "described as a vanity name." He noted that Mr. Perkins' full name was Aaron Andrew Perkins. The detective used that name to locate and preserve the account. Because he did not receive the return from Facebook until the day before the hearing, the detective had not yet obtained a subpoena for the account data but anticipated doing so. Additionally, the detective had taken steps to preserve two additional accounts associated with the victim so that he could obtain a subpoena for the data from those accounts. In the victim's account that he was able to review, he did not see any communications between the victim and Defendant.

During cross-examination, Detective Long testified that the original subpoena was for all Facebook accounts associated with a particular phone number and that the account belonging to Aaron Andrew was the only account associated with that number. He said that had more than one account been associated with that number, Facebook would have provided him with information for more than one account.

At the conclusion of the hearing, the parties asked the trial court to hold the motion in abeyance pending the collection of further information from Facebook. However, Defendant argued that her testimony alone was sufficient to authenticate the messages. The court said that "the prudent thing" was to wait until all the information was collected before ruling on the motion.

When court reconvened on August 5, 2024, the State asked the trial court to rule on its motion to exclude the messages. The court observed that there were "multiple layers" it must consider before admitting the messages at trial. The court noted that although Defendant "could, pursuant to the rules, authenticate" the messages if she chose to testify at trial, it was concerned "about the hearsay issue" given that the messages purported to

7

come from the victim, who had "refuted that these are her text messages." The court asked the parties to research the hearsay issue and stated that it would revisit the issue at the close of the State's proof should Defendant elect to testify.

No further information regarding the messages or any return on the subpoenas to Facebook appears in the record on appeal. Further, no order from the court ruling on the admissibility of the messages appears in the record on appeal.

## II. Trial

Sullivan County Sheriff's Office ("SCSO") Officer Roger Marshall, who worked as a resource officer at Miller Perry Elementary, testified that he lived in Hawkins County next door to a trailer park. He said that every evening on his way home, he saw a "young lady" who he estimated to be twelve or thirteen years old "standing at the end of the trailer next to my concrete driveway, and she's always standing there with a dog." He recalled that although he waved at the girl every day, she would never acknowledge him but look at him "with a solemn, sad face." At some point, he noticed that he no longer saw the girl standing outside. He asked his brother, whose house was in front of the officer's, whether he had seen the "little girl outside or anything." The officer's brother replied that he had not seen the girl "out in a pretty good while."

Concerned, Officer Marshall called the HCSO "for a welfare check on her." From his house, the officer saw "a county cruiser" go to the trailer where he had seen the girl. He said that "it didn't seem like" the county officer "was there very long to me, to make visual eye contact with her." After the HCSO deputy left, Officer Marshall drove to the home of the HCSO Chief Deputy and reported that he did not believe the HCSO deputy had spent sufficient time at the trailer to conduct a proper welfare check on the girl. He testified that the chief called the dispatcher and ordered that deputies be sent back to the trailer. Officer Marshall returned home to await the police.

During the second visit, deputies remained at the trailer "a pretty good while." Officer Marshall did not see first responders arrive. He said he never spoke with the girl or any of the adults who lived in the residence. He recalled that "[a] week or two after this happened, they up and moved."

During cross-examination, Officer Marshall said he was wearing his uniform and driving a marked cruiser when he encountered the young lady. He said he contacted authorities after he "hadn't seen her out in two months." He recalled that around the same time, "all the windows" on the trailer were "all blacked out."

HCSO Deputy Kevin Johnson testified that on May 17, 2021, he was dispatched to a residence on Country Lane to perform a welfare check on a child. He went to the trailer at approximately 7:30 p.m. and "[m]ade contact with a male subject at the residence." The man told the deputy that there was only one child at home. The man denied the deputy

entry into the home, saying "they had an aggressive dog in the house," so the deputy told the man to bring the child to the door. The deputy said that the child, a girl, "looked healthy and she was good." The deputy asked the man about other children in the home, and the man said that the children had gone to the store with their mother but were on their way home. The deputy "waited a few moments" until the woman returned and saw that the other two children "appeared fine and they appeared healthy." The deputy was told that the three children he saw were the only children living in the house. He "cleared the scene" and left at that point.

Approximately fifteen or twenty minutes later, a supervisor called Deputy Johnson and told him "there's possibly another child there" and ordered him to return to the trailer. Corporal Anthony Crosby also responded to the call. When they got to the trailer, they explained to the residents that they were there to check on the well-being of another girl. The residents "kept saying they've got aggressive dogs and . . . exotic animals, 'coons and everything. They didn't want to let us in the house." The residents also claimed that the other child who lived in the trailer was "staying with her uncle in Pigeon Forge."

After approximately thirty to forty-five minutes and after the chief deputy arrived, the deputies were allowed inside the trailer. Deputy Johnson described the condition inside the trailer as "[d]eplorable" and said, "I wouldn't want to have my children in it." He recalled seeing "[s]everal cages with [a] different variety of different animals," including raccoons, cats, and dogs. He also saw forty to forty-five bags "full of used cat litter piled up at the back door." Officers performed "a quick search of the house" and found the victim "underneath a small bed that had cardboard lined around it." The victim "appeared abused and very malnourished."

Corporal Crosby testified that Defendant told him and Deputy Johnson that the victim "was not there; she was in Pigeon Forge with her uncle. And they were going to a water park and would be back in two days." The corporal said Defendant "was very adamant that the child was not there." The victim's father "also began conversing through an open window, and they both agreed that the child was with their uncle in Pigeon Forge." The corporal "asked them to contact the uncle by phone so we could at least put the child on the phone," but Defendant and the victim's father "couldn't find his number" and could not "remember which motel or where they were staying." The corporal said their behavior "raised my suspicions."

Initially, Defendant told deputies that they "could not come in the house" because "the dog was vicious and would bite us." When deputies suggested Defendant get the dog under control, Defendant said they "could not come in the house because she had a racoon that had not been socialized and would attack us." After Corporal Crosby told Defendant he could see the racoon and that it was in a cage, Defendant "advised us [the racoon] was so wild, he would tear the cage up and . . . attack us all."

When Chief Deputy Tony Allen arrived, he attempted to "negotiate his way in," but Defendant "refused" his request. Eventually, deputies were allowed inside. Corporal Crosby entered the house and was searching the "back bedroom" when other deputies discovered the victim. The corporal described the victim's condition as "the worst case of child abuse" that he had seen while working in law enforcement. He added, "To put it in terms we can understand, [the victim] looked like someone who'd come out of a prisoner-of-war camp. I mean just very frail. I remember she had a black eye. Her hair was cut off." The corporal said the victim "just looked sad. Very sad."

Chief Deputy Allen testified that he became involved in the case when Officer Marshall called him to say he "was worried about a child" he had seen in the trailer park. He told the officer "to call 911" so there would be a record of the call. Later that same evening, the officer called him again to say that although a deputy had been to the trailer, "he was still worried." At that point, the chief called patrol supervisors and went to the trailer himself.

Defendant told Chief Allen "[t]hat no other child was there. That they had a racoon, some animals, [and] a vicious dog. That we can't come in." The chief said he told Defendant that he "had an obligation and a duty" to check the welfare of the other child. Once inside the trailer, the chief went "to the very back bedroom" where he saw cardboard that "[l]ooked out of place." The chief knelt, pulled out the cardboard, and shone his flashlight under the bed. He saw what he believed to be "a skeleton," adding, "I've been in law enforcement for 29 years, and I was shocked of what I saw." He said that when he realized it was a child, he coaxed her out from under the bed. Her appearance "was shocking." The chief immediately took the victim outside and placed her into one of the cruisers. He recalled that after a while, the victim said she was hungry, and she was given food and drink.

Photographs of the inside of the trailer were exhibited to Chief Allen's testimony. He recalled seeing animals in cages, animals running loose, and animal feces throughout the trailer. He said that the trailer was dirty and cluttered to the point that moving around was difficult.

Former HCSO Detective Jeff Greer, who had retired by the time of trial, testified that on May 17, 2021, Chief Allen called him and told him to get to the trailer as quickly as possible. After being briefed on the case, he went to speak to the victim. He said that he "was astounded" at the victim's appearance and that he had never seen "someone that skinny or malnourished. I mean, collarbone sticking out; eyes sunk in; cheeks sunk in; little bitty arms and tiny legs." He asked the victim if she was hungry, and she said she was starving. The detective offered to get the victim food from McDonald's, and she asked for a large Big Mac Meal, chicken McNuggets with sweet-and-sour sauce, and a Dr. Pepper. When he returned with her food, the victim "went at it like she was starved." He recalled that she went so far as to use her fingers to get every drop of sauce from the packets. When

workers from the Tennessee Department of Children's Services ("DCS") arrived, they "fussed at" the detective for getting food for the victim because of "refeeding syndrome." The detective testified that the noxious smell inside the trailer was so overpowering that he "could only stay for three or four minutes."

The victim testified that prior to May 18, 2021, she lived with her father, Defendant, Mr. Perkins, and Defendant's three children, two of whom were fathered by Mr. Perkins and one of whom was fathered by the victim's father. Cats, dogs, squirrels, and a racoon also lived inside the trailer. The victim had her own bedroom, but the room had no door separating it from the rest of the trailer. The victim recalled that Mr. Perkins, who "was just supposed to come live with us for a while and then leave," slept in the living room.

The victim testified that Defendant began dating her father when they lived in Florida and that, after a time, Defendant began to fill the role of parent in her life. After the family moved to Tennessee, the victim attended Volunteer High School. At some point, the victim's father and Defendant elected to remove her from Volunteer High and to have Defendant home school her. The victim recalled that she "was given workbooks, and I was supposed to work through those work books." She said that Defendant sometimes helped her work through the books, "[b]ut in the end she would end up just giving me the answers." During this time, Defendant cared for the victim while her father and Mr. Perkins worked outside the home.

The victim recalled that during the six months before May 2021, Defendant made the victim "clean up after all the animals; sweep the floors; like, clean all the litter boxes and stuff like that." The victim said that Defendant would set a timer on an electronic device and that she had to complete her chores before the timer ended or face punishment. She said that, on a typical day, she had to rise at "a certain time," usually 6:00 a.m., "and I'd go sit out in the living room on the floor. And then I'd have, like, certain times to do chores. I'd have certain set bathroom times. And then I'd get told to go to bed whenever they felt like telling me to go to bed," usually "11:00 to midnight sometimes if not later." The victim testified that Defendant forced her "to sit with my back straight up against" several "cat litter jugs that were filled with water" while holding her "hands open with my palms on the floor." She said Defendant made her "sit with my palms up" to prevent the victim from "picking at scabs" on her hands.

The victim stated that she was not permitted to engage with the younger children, who were not made to follow the same schedule or to sit on the floor for extended periods of time. Additionally, the victim "wasn't allowed in the kitchen or anywhere past, like, a certain area in the house." She said that she "couldn't do anything unless I was given permission" by Defendant. If the victim deviated from her schedule or moved from her position without permission, she would "get in trouble," which "typically" meant that she would "get hit by" Defendant. She said that Defendant struck her on her "[f]ace, body, arms, anything that she could hit" with her fists, "a wooden spoon, a can of Chef Boyardee,

11

a . . . glass bowl, and a couple of other things." Regarding the Chef Boyardee can, the victim recalled that Defendant "backed" her "into the bathtub in the back of the house" and threw the can at the victim, striking her. On another occasion, Defendant struck the victim in her face and knocked one of her front teeth out. The victim was not taken to the doctor or the dentist. The victim testified that her father and Mr. Perkins also struck her and recalled a specific time that Mr. Perkins struck her in the face with his hand. Her father also struck her in the face. The victim said her father "gave me a black eye for my 16th birthday."

The victim said that she was not permitted to cook for herself and that she was only "[s]ometimes" permitted to eat. On those occasions when she was permitted to eat, she was given only "[p]lain oatmeal; a can of Chef Boyardee for lunch and/or dinner; or a can of, like, Campbell's soup out of the can cold." The others in the house ate "[t]ypical food. They'd make fried fish, lunch, dinner, just like typical food that you and me would eat today." The victim said that she wanted to eat the other food but could not recall whether she had ever specifically asked to be permitted to do so. The victim testified that Defendant or Defendant's oldest child would bring the food to her spot on the floor. No one else ate with her. The victim said she did not dare get up and go get her own food for fear that she would "get beat." In addition to the food restrictions, Defendant and the other adults allowed the victim to drink only water and forced her "to drink so much water per day." She said that she was given the water in a pitcher that had "marks on it as to how much I had to drink within a certain period of time" and that the pitcher remained on the floor next to her throughout the day.

The victim testified that she noticed herself "getting skinnier" and recalled her father telling her that she "looked like a crackhead like my biological mom," which made the victim feel "[h]orrible." She said that Defendant and the other adults "called me a bitch and told me that I was worthless. That I would never amount to anything. That I would end up in a body bag before my 18th birthday." The victim adamantly denied inflicting any injuries on herself. She said the bruises on her head were caused by Defendant or one of the other adults striking her head against the wall. Bruises to her legs were caused by "just getting hit by stuff." Bruising on her spine was caused by the way she was forced "to sit up against, like, the hard surface. Or, like, doing sit-ups" for "punishment."

The victim testified that exercise was often used as punishment. She said she would be forced "to do sit-ups, squats, planks. I'd have to do, like, a duck walk holding gallons of water. I had to dead-lift the litter jugs full of water." These punishments were typically inflicted when she failed to perform her chores to Defendant's "and everybody else's standards," if she "got up to use the bathroom whenever I wasn't supposed to," or if she "didn't finish my water by a certain time." She said Mr. Perkins generally oversaw her exercise as punishment.

12

In addition to beatings, food restrictions, and forced exercise, the victim was subjected to the involuntary shaving of her head "[m]ore than once." She recalled a particular occasion when Defendant "dragged me by my hair from one end of the house to the other end of the house to the bathroom" to get the clippers and then, when Defendant could not find the clippers, she "dragged me across the house back to her bathroom and shaved an undercut in my head." On another occasion, Mr. Perkins shaved "a spot" on the front of the victim's head after Defendant and her father "instructed" Mr. Perkins to do so. The victim identified herself in photographs in evidence that showed a portion of her hair shaved, but she could not recall who had last cut her hair against her will.

Defendant also prevented the victim from bathing on a regular basis. The victim said, "I was only able to get to take a shower when I was told I was able to take a shower." She recalled that the longest she went without bathing was two months and that she felt "[d]isgusting." The victim said she had a single basket of clothing that was never laundered. She said that she was not permitted to do her own laundry because "the washer and dryer were in the kitchen." She stated that she was forced to "filter through and wear the same things over and over again," which made her feel "[g]ross."

The victim recalled that during the relevant time frame, Mr. Perkins and her father worked outside the home, but Defendant did not. When neighbors came to visit, the victim was sent to her room.

The victim recalled that she attempted to leave the house on May 17, 2021, because she was "tired of being there. Tired of being hurt every day. Tired of sitting there." She said that a neighbor "picked me up from down the road" and, after speaking to Defendant on the phone, "sent me back in the house." The victim admitted that no one was home when the neighbor told her to go back in the trailer but said that she went "back to sitting where I was supposed to" because "I was afraid to get in trouble. I was already going to get in trouble for leaving the house. Why make it worse." The victim said she did not at any point travel to Pigeon Forge to a water park or to go to an uncle's house in Sevier County.

The victim testified that later in the evening on May 17, 2021, she was in the trailer with Mr. Perkins and Defendant's second oldest child. Someone knocked on the door while Mr. Perkins was in the shower, and the younger child answered it. When they realized that a police officer was at the door, the victim "went and knocked on the bathroom door and told" Mr. Perkins before returning to sit where she "was supposed to sit." The victim recalled that Mr. Perkins "got them to go away" after Defendant and her father returned from the grocery store with the other children. The police returned to the trailer a short time later. When officers arrived the second time, Mr. Perkins "told me to get under the bed. So I got under the bed." She said Mr. Perkins ordered her to hide "because of the way that I looked." While she was under the bed, she "was given a phone" to speak to someone else and tell them that she was "with my uncle in Sevierville and Pigeon Forge."

The victim said that she did not have a phone or tablet of her own at that point and had no way to contact anyone. The phone was taken from the victim immediately afterwards. She said she was too scared to try to use the phone to call anyone else.

The victim testified that when she heard officers come into the room where she was hiding, she was scared because she "didn't know what was going to happen." She said that she feared being taken out of the trailer "because I was afraid that I would have had to go back and then get in trouble for the entire situation." She said that after she was found, she was "scared but relieved." She recalled that one of the police officers brought her food from McDonald's and that she "felt sick" after eating it.

The victim was taken from the scene by ambulance and admitted to the hospital. While there, she was given "a drawstring bag full of snacks" that she ate immediately because she "didn't think that I would be able to get anything else like that." She explained, "I was afraid that I was going to have to go back to the house, and I wouldn't be able to take them with me." Eating so much food in one sitting made her sick. The victim was transferred to Niswonger Children's Hospital for treatment. There, she participated in physical therapy and was given "recreational time." Hospital staff also shaved the victim's head "the rest of the way" so that her hair "was all an even length" rather than "choppy."

The victim said that before being removed from the home, she had not visited the doctor in more than two years. She had not had a regular menstrual cycle for more than six months, and, in any event, Defendant refused to provide her with feminine hygiene products. The victim recalled an occasion when Defendant and her father weighed her and then forced her to drink water to gain weight. She said no one in the house provided her with extra food. When she arrived at the hospital, she said she weighed seventy-two pounds. Following her release from the hospital, the victim was placed into foster care.

During cross-examination, the victim denied that the bathroom door in the trailer was removed because she was having episodes of bulimia and vomiting. The victim said both Defendant and her father "were present the day I was removed out of school." The victim acknowledged that there were times that she was left alone at home and that there was food in the pantry and refrigerator that was not locked away. She said that she did not attempt to leave or get help because "the neighbor had already known what was going on" and she "didn't know of anybody else that would have cared or I didn't know of anybody else to go to at that time."

The victim admitted that she argued with her father and Defendant because she "felt like I shouldn't have to be the one taking care of animals that weren't mine to the extent that I was taking care of them."

The victim said she was given some food on a regular basis "[f]or the most part." She said that the family went out to dinner without her and that they did not bring any restaurant food back to her. She recalled a time when one of the younger children brought

14

her "a can of soup" after Defendant sent her "to bed without food." The victim acknowledged that Defendant and her father appeared concerned that she was losing weight and that at one point, they gave her protein shakes. The victim agreed that she was told that she was not permitted to go into the kitchen because the adults believed that she had been "tampering with food." The victim denied hiding under the bed because she was ashamed of her looks and maintained that Mr. Perkins told her to hide.

Doctor Andrew Wilt, a board certified pediatrician and "sub-board certified pediatric hospitalist" working at Niswonger Children's Hospital, testified as an expert in pediatric medicine and hospitalization. Doctor Wilt treated the victim while she was hospitalized at Niswonger from May 18 to May 24, 2021. The doctor described the victim as alert, cooperative, and articulate but timid. He recalled that the victim "was hungry on admission and ate very well during her stay" at Niswonger. Photographs of the victim taken upon her admission were exhibited to the doctor's testimony. The doctor observed that the victim had bruising on her forehead and a black eye with subconjunctival hemorrhaging in the corner of her eye. The victim also had "bruising across her left scapula" and "down her spinous processes" as well as "paraspinal bruising." He said that these injuries were not the kind "one would encounter during the course of their normal everyday activities." Specifically, he said that "bruises on the posterior of your body are not likely to be achieved either through normal activities or . . . in cases of individuals who are exhibiting self-injurious behaviors." The victim also had a "linear" abrasion on "the top of her right ear." The doctor diagnosed the victim with "severe malnourishment due to neglect in the home environment" and "physical abuse in the home environment."

Doctor Wilt recalled that the victim reported that "she was always hungry" but "wasn't allowed to have more after meals." At one point, the victim was given "a protein drink" with "a laxative in it[,] which she said caused her terrible diarrhea." He said the victim weighed only eighty-three pounds when she arrived at Niswonger, placing her body mass index at "less than .01 percentile." He explained that the victim's weight meant that she "would have been the smallest" of 10,000 other "age-matched girls." He testified that he performed medical testing "to look for underlying organic problems that can contribute to malnourishment" but that he found no medical cause for the victim's condition. He said the victim was not "merely thin" but had "muscle wasting." Using photographs of the victim, he explained that the victim's buttocks were "so wasted" that she had indentations where muscle would normally be present and had "a very generous amount of space between her buttocks" such that "you can literally see this child's anus." He stated that "normally you would have to spread somebody's buttocks in order to see the anus" but that the victim's was readily apparent because of the "egregious amount of severely malnourished state."

Doctor Wilt referred the victim to a nutritionist at Niswonger who noted that the victim was "extremely at risk for something called a refeeding syndrome," which, he explained, "is a metabolic effect of providing a severely malnourished individual with

basically sudden nourishment." He explained that the reintroduction of nourishment in a severely malnourished individual would result in the release of insulin, which, in turn, could cause an electrolyte imbalance. The doctor testified that refeeding syndrome could cause low potassium, low magnesium, or low phosphorous and that, of these, "low phosphorous is the most common" and was "life-threatening" if not "addressed in a timely fashion." The victim had low phosphorus levels when admitted to the hospital, and she needed treatment to save her life, including supplemental phosphorus, potassium, and magnesium. In addition, the victim had "orthostatic intolerance," which meant that "she was unsteady on her feet even just getting up from the bed" and that she required assistance from the nursing staff even "to use the restroom in there in the room." He described the orthostatic intolerance as "a physiologic side effect of . . . her malnourished state." He opined, "I believe within the degree of medical certainty that . . . she had severe enough malnourishment that it was likely to cause serious bodily injury or death."

During cross-examination, Doctor Wilt said that he relied, in part, on the victim's narrative to arrive at his diagnosis but that he supplemented the narrative with medical examination and testing. Regarding bruising to the victim's spine, he said that it was "unlikely that most individuals would rock against a wall . . . hard enough to produce bruising" of the magnitude of that present on the victim when the doctor examined her. He testified that lying in a single position for a sustained period would not have caused bruising of the kind he saw. He also testified that it was "not typical in clinical practice to see more bruising in a malnourished child than . . . an obese child." He reiterated that even though she was provided with adequate nourishment, the victim "had the refeeding syndrome." He said that while it was true that certain diseases could have accounted for the victim's weight loss, "[i]f these diseases are not addressed, the merely providing her . . . with adequate nourishment should not produce the natural history that we witnessed of, okay, she gained 12 pounds." The doctor explained further that if the victim remained "in a nourished state without anyone addressing some hypothetical underlying additional pathology," then "that argues against any hypothetical underlying additional pathology being present." He said that the victim "did not exhibit any characteristics of bulimia" during her hospitalization and that, in any event, bulimia "would have different presenting features." During her stay at Niswonger, the victim gained "just short of twelve full pounds." Doctor Wilt explained that he ruled out an eating disorder diagnosis because the victim ate "robustly" while those with eating disorders "most often" resisted "typical forms of nourishment."

Ashley Kiser, a registered dietician who was working at Johnson City Medical Center "taking care of the pediatric population" when the victim was admitted to Niswonger, testified as an expert in nutrition. Ms. Kiser said that she received a referral from the victim's treating physician and that she spoke to the victim shortly after she was hospitalized. She described the victim as "very welcoming" and "ready to eat," so she was "easy to work with." Ms. Kiser said the victim's physical appearance led her to believe that the victim was malnourished. Ms. Kiser observed "severe muscle wasting" of the

16

victim's entire body. She noted wasting around the victim's clavicle, arms, hands, and legs. Additionally, she noted the wasting of both muscle and fat on the victim's back, thighs, and buttocks. She said that the victim had no fat or muscle on her buttocks and that "her spine was very prominent." Ms. Kiser added, "I had never seen this level of severe malnutrition in . . . my time working there and since."

Ms. Kiser recalled that the victim told her that "she did not have a scale at home" but had weighed herself on "vacation the summer before" her hospitalization and that she had "lost about 20 pounds" unintentionally. She said that loss of twenty-one percent of body weight was "[p]retty substantial, especially for a kid." Ms. Kiser testified that the victim's behavior during her hospital stay lead Ms. Kiser to conclude "that that weight loss she had was unintentional." She said the victim "was a wonderful eater" who "wanted to eat." She recalled that the victim often ordered a second tray at meals and ate snacks between meals. Ms. Kiser testified that the victim's open demeanor and willingness to eat indicated that she was not suffering from an eating disorder. She explained that her eating disorder patients were unwilling to talk to her, had to be coaxed to eat at all, and "want[ed] to see the calories on everything." She added, "[I]t was very different than eating disorder patients that I've had." Ms. Kiser said that hospital staff had to carefully monitor the victim's food intake to manage her refeeding syndrome, which she said was "difficult because she was so hungry and would ask everyone for food coming through." Ms. Kiser agreed that, within a reasonable degree of medical certainty, her observations of the victim were consistent with the reported history of malnutrition by neglect rather than by a self-imposed condition.

During cross-examination, Ms. Kiser testified that she did not observe the victim face-to-face every day during the hospital stay but that she monitored her progress. Ms. Kiser said the victim's "great weight gain in the hospital" was inconsistent with a diagnosis of "an eating disorder." She stated that those monitoring the victim's meals reported that she ate 100 percent of all the meals she was served. Ms. Kiser agreed that, had the victim been vomiting after meals, she would not have gained weight while in the hospital.

At the conclusion of Ms. Kiser's testimony, the State rested. The trial court denied Defendant's motion for judgment of acquittal. Following a full *Momon* colloquy, the Defendant chose to testify.

Before the jury returned to the courtroom, Defendant raised the issue of the Facebook messages again and asked the court to rule on their admissibility. The trial court stated that it was "fair to say" that the messages were relevant and that the messages "could" potentially be authenticated by Defendant but that it was concerned the messages were hearsay. Defendant asserted that the May 17, 2021 messages were admissible as statements against the victim's interest and as statements of "present sense impression" because they were made while police officers waited at the door. The State argued that the messages were hearsay, that they did not qualify as prior inconsistent statements because

the victim denied that she sent the messages, that they could not be authenticated, and that they were unreliable. The court concluded that the messages "are hearsay, first and foremost" and that they did not fit within any exception to the rule against hearsay. The court stated that it also had "questions about them with respect to their reliability." Ultimately, the court deemed the messages inadmissible.

Defendant acknowledged that she had been convicted of "scheme fraud due to theft" and "grand theft." She said she shared two children with Mr. Perkins and one with the victim's father. She claimed that the victim's father, whom she never married, "wouldn't allow" her to have any "legal" authority over the victim. Defendant testified that she became a stay-at-home mother after moving to Tennessee so that she could homeschool her two oldest children but denied homeschooling the victim during that same time. Defendant said that she went with the victim's father when he removed the victim from school "to help her [because] she requested me to come with" them to "get her stuff." Defendant said the victim's father "started homeschooling her through a different place" operated "through a church in Kingsport."

Defendant identified photographs depicting food inside the pantry and kitchen of the trailer where she lived with the victim, the victim's father, Mr. Perkins, and her children. She claimed that she prepared the family's meals with the help of her oldest daughter and maintained that the victim "would help too because I had a bad knee at the time." She said that they "preplanned" the meals by putting "popsicle sticks" into a jar and letting the victim or Defendant's oldest child "pick out, like, seven of the meals." She said the three of them would "go grocery shopping to prep for those." She insisted that the victim ate regularly and that she "freaked out" when the victim began to lose weight. Defendant testified that she "grew up with throwing up my food and stuff trying to get my parents' attention" and that "the worse I acted out, the more attention I got from my parents." Defendant said she removed the bathroom door to "catch" the victim "when she was throwing up to try to stop and intervene and talk to her." Defendant said she tried to speak to the victim's father about getting her help, but he "refused." She also claimed that she tried to take the victim to "Turning Points" and that the victim "jumped out of the vehicle" at a stop sign and ran back home. At that point, Defendant started "keeping track" of the victim's weight. Defendant denied restricting the victim's food and said that "her special treat was literally she wanted vegetables and stuff instead of junk food for her snacks." Defendant claimed to have contacted fourteen or fifteen "different places by email for children with behavior issues. And then I called a bunch of different places" but said that she could not get help because she was not the victim's biological or legal parent.

Defendant said that she would make the victim "write sentences" when she "was disrespectful" and that "that was the extent of" punishment that she inflicted on the victim. She insisted that the victim sustained her multitudinous injuries, which included a black eye and missing front tooth, through "[s]elf-harm." Defendant testified that the victim rocked her back into the "studs" of their trailer "as hard as she could, and it would shake

the whole trailer," scaring the younger children. She testified that the victim caused holes in the walls and bruises to her face by "smacking her forehead against it until her dad came out . . . to talk to her." Defendant said that the victim's self-harming behavior began after Defendant gave birth to her youngest child, whom she shared with the victim's father. She claimed that two weeks after the child's first birthday, she "started leaving all day because" the victim's "stuff was getting worse. I have severe PTSD and anxiety from things that took place in Florida[,] and it triggered it." Defendant testified that the victim "ran away multiple times when we weren't home."

Defendant said that when the police came to the residence the first time on May 17, 2021, she "was at the grocery store with all three of my kids" and the victim's father. Defendant said that when the police came a second time, she told them that she "was not going to deal with it" and that she was going to get the victim's father "because it's his kid." She admitted telling "one officer" that he could not come inside because she had a dog that was "not good with strangers. And then I did have the racoon and stuff, and I didn't know how he'd act to strangers in the home because we'd never had strangers in the home."

During cross-examination, Defendant conceded that on May 17, 2021, the victim was in serious need of medical attention and that she was suffering from a condition causing serious bodily injury and agreed that the victim's condition was so severe that she could have died. Defendant said that the victim's father was violent and insisted that she had contacted both the police and DCS about his behavior and tried to get help for the victim. Defendant maintained that the victim cut her own hair and that "[h]er hair has been like that for since even before my son was born. She's had it in that style which is even why when I went and got her the wigs, because she didn't like it all the time." Defendant identified the victim's school photograph from Volunteer High and admitted that the victim's hair did not look like it did when she was taken from the home.

Defendant insisted that despite her appearance when she was taken from the home—filthy, emaciated, and racked with bruises—the victim "wasn't treated badly in the home." Defendant insisted that the victim got bruises on her back from rocking her body against the wall and on her face from hitting her head on the wall. She denied striking the victim and said she had never hit the victim with a wooden spoon. Defendant agreed that she assigned chores to the victim but described them as "normal chores for a 16-year-old." Defendant said there were multiple dogs inside the trailer, including two adult dogs and a litter of puppies. There were multiple cats in the home, including four adult cats and a litter of kittens. Additionally, three squirrels, a rabbit, and a racoon lived in the trailer. Defendant stated that there were at least four or five litter boxes inside the trailer and claimed that the victim chose to scoop the litter as one of her chores. The victim was also expected to sweep the floors every day.

Defendant said that the victim's father was violent toward her and that he was using drugs but that she could not get away because she did not have family in the area, did not have a car, and had no financial support. Later, she admitted that at the time the victim was removed from the home, Defendant's parents lived nearby, and she had a car that she drove to her parents' house daily. Defendant testified that, after their arrest, the victim's father had reached out to her to relay his "plans of wanting to kill [the victim] before his sentencing. And then told my parents if I said anything, he'd kill me." She said that she "asked the detective to let [the victim] know that he was coming after her" because he was attempting to discover where she worked. Defendant acknowledged that the victim's father had pleaded guilty to charges related to the abuse and neglect of the victim but claimed that he only did so "because he didn't want the stuff that I have to come out or the fact of what he did to [the victim] to come out."

Defendant admitted that she did not report any abuse when the police came to the trailer on May 17, 2021, but said that she did not do so because the victim's father "was holding my one-year-old son and he had a firearm in the house." She also admitted that she denied the officers entry and that she talked to them outside, away from the victim's father. She admitted that she did not tell the officers that the victim's father had a gun inside the house. She denied lying to the police and insisted that the victim's father came up with the story about the victim being at a water park with her uncle. Defendant denied withholding food from the victim but agreed that the victim's father told police that they had denied her food as punishment. Defendant also denied making the victim exercise for punishment and claimed that she "didn't even know about that until this all started." Defendant denied making the victim sit on the floor and said that, in fact, she had "never seen her sitting on the floor." Despite earlier having said that she had nowhere to go to escape the victim's father, Defendant claimed that she spent all day every day at either her parents' house or the victim's uncle's "shop."

Defendant acknowledged that she signed forms in the space marked for parent or guardian to allow the victim to be removed from school. She agreed that she was the victim's guardian "[i]f something happened." Defendant admitted that she signed a document allowing Volunteer High to release the victim's school records to Apostolic Gospel Academy. Defendant maintained she played no role in the victim's education.

Defendant admitted that she had been convicted of the crimes of "fraud, swindle, obtain property under $20,000"; "larceny theft $300 to $5,000"; and misdemeanor larceny. She said that she "signed the pleas" for each of the charges.

In rebuttal, the State offered the testimony of Tracy Burke, the court appointed special advocate assigned to the victim and Defendant's three children, who testified that she was appointed to the case in August 2021. Ms. Burke said that, at one point, Defendant told her "that she had notified the police department that [the victim] was having behavioral issues" and provided Ms. Burke with a list "of persons that could verify [the victim's]

behaviors." Ms. Burke said that she contacted the HCSO and learned that "the only report on file was for the date of the [victim's] removal." She testified that "because the police do not always do a report," she requested records from the emergency center for "any time that they had been dispatched to that address." She stated that police had responded to the residence only twice between 2019 and 2021 and that one of them was for the date of the children's removal.

Regarding the list provided to her by Defendant, Ms. Burke testified that Defendant claimed the individuals on the list "could tell me about the behaviors that [the victim] was exhibiting." Ms. Burke contacted seven of the people on the list, all of whom "confirmed that they had been told of [the victim's] behaviors" but none of whom had "personally witnessed any of those behaviors."

Ms. Burke testified that Defendant never mentioned any domestic violence issues involving the victim's father. Additionally, Ms. Burke said that she had "witnessed their interactions in visitations" and that she had never seen "any indication that there was domestic violence present."

Ms. Burke said that after the victim was removed from the home, she no longer displayed any signs of physical abuse. Ms. Burke said that the victim had no bruises, that she did not display any evidence of an eating disorder, and that she gained "weight steadily throughout the time that I was involved with her." Ms. Burke recalled that when she first met the victim on August 23, 2021, the victim weighed 116 pounds and that her hair had started to grow back. Ms. Burke said that she followed up on the victim's education and learned that Defendant signed a document regarding the homeschool program that they had chosen for the victim.

The victim's foster mother testified that the victim came to live with her family in May 2021. She said that when the victim arrived, "she was very thin" and "pale" with "bruises on her face" and "healing black eyes." She stated that the victim acclimated to the family "pretty quickly. She ate with us; she helped us cook; she played with our little one." She recalled that, only a month after the victim's arrival, they "got a call for a baby" and that they hesitated to take the baby until the victim insisted. She said that the victim was eager to start school. She described the victim's eating habits as "healthy" and said that the victim "ate whatever we made." She said the victim did not engage in any self-harm.

The victim's foster mother called in a favor from a friend who was a dentist to make the victim a retainer to replace the victim's missing front tooth. The victim finished school but continued to live with them even though she was nineteen years old. She stated that the victim had maintained a steady weight of 140 pounds "for about two years now."

Based upon this evidence, the jury convicted Defendant as charged of aggravated child neglect, making a false report, and child abuse.

### III. Sentencing Hearing

Neither party presented live evidence at the sentencing hearing. The presentence report, which was exhibited to the hearing, established that Defendant had 2015 Florida convictions of "Fraud-Swindle" and theft of property valued between $500 and $1,000. She also had a 2010 Alabama conviction of theft of property valued at less than $500. Additionally, the sentence of probation imposed for her Florida convictions was revoked at least once.

The State argued that the trial court should enhance Defendant's sentence based on her criminal record, her role as a leader in the offenses, and her abuse of position of private trust. The State also asked that the court enhance Defendant's sentence because the victim was particularly vulnerable because of her age, that Defendant treated or allowed the victim to be treated with exceptional cruelty, and that the personal injuries inflicted on the victim were particularly great. The State asked the court to align the sentences consecutively based on Defendant's being an offender whose record of criminal activity is extensive and being a dangerous offender whose behavior indicated little to no regard for human life and who had no hesitation about committing a crime with a high risk to human life. Finally, the State noted that Defendant was on probation when she committed the offenses in this case. The State argued that Defendant was a Range I offender for the conviction of aggravated child neglect and a Range II offender for the conviction of filing a false report. The State asked the trial court to sentence Defendant at the top of the range.

Defendant agreed that she was a Range I offender for the conviction of aggravated child neglect but disputed her classification as a Range II offender for the conviction of filing a false report, arguing that although the convictions were felonies, the "offenses occurred in another state" and that they were "offenses against property." Defendant argued that the trial court should mitigate her sentence because "she was a minor player" in the offenses, because her mental illness reduced her culpability, because she tried to get the victim help, because she assisted in the investigation, and because she acted under duress. Defendant also asked the court to align the sentences concurrently because, given that her prior criminal history involved only property crimes, there was no proof that lengthy incarceration was necessary to protect the public.

When making its sentencing determination, the trial court found that Defendant had a history of criminal convictions or criminal behavior in addition to that required to establish the appropriate range, that Defendant was a leader in the commission of the offenses, that the victim was particularly vulnerable because of her age, that Defendant allowed the victim to be treated with exceptional cruelty beyond that necessary to establish the element of serious bodily injury, and that Defendant abused a position of private trust. *See* Tenn. Code Ann. §§ 40-35-114(1)-(2), (4)-(5), (14). The court determined that none of the mitigating factors advanced by Defendant applied. The court concluded that Defendant

22

was a Range I offender for Count One and a Range II offender for Count Two and ordered Defendant to serve the maximum within the range for all her convictions.

For purposes of imposing consecutive sentences, the trial court found by a preponderance of the evidence that Defendant was a professional criminal who had knowingly devoted her life to criminal acts as a major source of livelihood, observing that Defendant previously committed offenses while on probation. The court also found that Defendant's record of criminal activity was extensive, noting that she had three previous felony convictions and one misdemeanor conviction in addition to the offenses in this case. Additionally, the court determined that Defendant was a dangerous offender who had no hesitation about committing a crime in which the risk to human life was high based on her "[s]tarving somebody to the point of death." Finally, the court concluded that Defendant committed the offenses in this case while on probation for her convictions in Florida, observing that the certified judgments entered into evidence by the State established that "because of the consecutive sentencing" in the two cases, Defendant "would have been on probation when this activity began."

The trial court described Defendant as "a manipulator" who refused "to accept responsibility for anything." The court concluded that Defendant's claims that she tried to get help for the victim as well as the Facebook messages that Defendant "purported to offer to convince the court that [the victim] had sent" demonstrated that Defendant was a "master manipulator" and a "dangerous individual who contrived all these things to attempt to put" herself into a "better position with the court or perhaps exonerate" herself. The court stated that Defendant needed to be deterred both generally and specifically and that the efforts to rehabilitate Defendant "just don't work." The court sentenced Defendant to twelve years for the conviction of aggravated child neglect, eight years for the conviction of making a false report, and eleven months and twenty-nine days for the conviction of child abuse and aligned all the sentences consecutively, for a total effective sentence of twenty years, eleven months, and twenty-nine days' incarceration.

IV. Motion for New Trial Hearing

Defendant filed a timely motion for new trial challenging the sufficiency of the convicting evidence, the admission of the photographs of the victim and "404(b) evidence," and the exclusion of the Facebook messages.

At the hearing on Defendant's motion, neither party presented live evidence. Defendant argued that the evidence was insufficient to support her conviction of aggravated child neglect because the victim testified that she only went to bed hungry one time, because the victim's weight loss of "20 pounds over the course of a year" was not "egregious," and because "there was some evidence of self[-]harm such as [the victim] picking." Defendant argued that the trial court erred by admitting photographs of the victim because they "were just inflammatory and prejudicial." Defendant claimed that the

23

trial court erred by excluding the screenshots of the Facebook messages because "they were time stamped at the time that the officers were there" and "substantiated by" her own testimony. Finally, defense counsel said that he "recall[ed] some 404(b) evidence being admitted" but that he "couldn't recall" what it was and merely wanted to "reserve that and then I will leave it to the court as the court is aware of the issues" in "both in the pretrial motion and the objections."

The State argued that the evidence was sufficient to support Defendant's convictions of aggravated child neglect and child abuse because "[t]his wasn't just a matter of food," and instead, Defendant strictly controlled "every aspect of" the victim's life and struck the victim, causing bruises all over her face and body. The State noted that the victim "was extremely, extremely emaciated and was in fact at risk of dying." The State argued that the evidence was sufficient to support Defendant's conviction of making a false report because she lied to the police and told them that the victim "was off with an uncle at a water park." The State asserted that the trial court did not err by admitting the photographs because their probative value regarding the condition of the victim's body outweighed any danger of unfair prejudice. The State contended that the trial court did not err by excluding the Facebook messages because, in addition to the fact that they could not be authenticated, Defendant failed to establish that the messages were admissible under Tennessee Rule of Evidence 608 or the Channon Christian Act.[4] Finally, the State argued that it could not respond to a 404(b) argument "without knowing what" Defendant was claiming.

---

[4] This is a reference to Code section 24-7-125, which provides:

> In a criminal case, evidence of other crimes, wrongs, or acts is not admissible to prove the character of any individual, including a deceased victim, the defendant, a witness, or any other third party, in order to show action in conformity with the character trait. It may, however, be admissible for other purposes. The conditions which must be satisfied before allowing such evidence are:
>
> (1) The court upon request must hold a hearing outside the jury's presence;
> (2) The court must determine that a material issue exists other than conduct conforming with a character trait and must upon request state on the record the material issue, the ruling, and the reasons for admitting the evidence;
> (3) The court must find proof of the other crime, wrong, or act to be clear and convincing; and
> (4) The court must exclude the evidence if its probative value is outweighed by the danger of unfair prejudice.

Tenn. Code Ann. § 24-7-125.

Following the State's argument, defense counsel asserted that the "404(b)" was "about the emails" that Defendant purportedly sent to different organizations to get help for the victim.

The court ultimately denied Defendant's motion for new trial, and this timely appeal followed.

**Analysis**

In this appeal, Defendant challenges the admission of photographs of the victim, the admission of character evidence, the exclusion of printed screenshots of Facebook messages, the sufficiency of the convicting evidence, and the imposition of consecutive sentences.

I. Photographs

Defendant contends that the trial court abused its discretion by admitting photographs of the victim depicting her condition upon her removal from the home, arguing that the probative value of the photographs was outweighed by the danger of unfair prejudice because the photographs were voluminous and graphic, because they were not necessary to the medical testimony, and because they were shown to the jury more than once. The State asserts that the trial court did not err.

"A trial court has broad discretion regarding the admissibility of photographs." *State v. Davidson*, 509 S.W.3d 156, 198 (Tenn. 2016) (citing *State v. Banks*, 564 S.W.2d 947, 949 (Tenn. 1978)). To be admissible, photographs "must be verified and authenticated by a knowledgeable witness" and must be "relevant to the issues at trial." *Id.* (first citing *Banks*, 564 S.W.2d at 949; and then *State v. Vann*, 976 S.W.2d 93, 102-03 (Tenn. 1998)). When determining the relevance of a photograph, the court should consider "the photograph's accuracy and clarity, the need for the photograph to be used in addition to testimonial evidence to relate the facts to the jury, and the need to admit the photograph to establish the elements of the crime or to rebut the defendant's contentions." *Id.* (citing *Banks*, 564 S.W.2d at 951). After concluding that a particular photograph is relevant, the "trial court must then weigh its probative value against any undue prejudice." *Id.* (citing *Banks*, 564 S.W.2d at 951). Even relevant photographs may be excluded if their probative value is substantially outweighed by the danger of unfair prejudice. Tenn. R. Evid. 403; *Banks*, 564 S.W.2d at 950-51. Importantly, admissibility does not turn on "whether the evidence is prejudicial, but whether it is *unfairly prejudicial*." *Davidson*, 509 S.W.3d at 199 (quoting *Vann*, 976 S.W.2d at 103) (emphasis in *Vann*). Our courts define "unfair prejudice" as "[a]n undue tendency to suggest decision on an improper basis, commonly, though not necessarily, an emotional one." *See Banks*, 564 S.W.2d at 951. "Exclusion of relevant evidence," including photographs, "is an extraordinary remedy that should be used sparingly, and the party seeking to exclude the evidence bears a heavy burden of

25

persuasion." *Davidson*, 509 S.W.3d at 198 (citing *State v. James*, 81 S.W.3d 751, 757-58 (Tenn. 2002)).

"The decision of a trial judge to admit a photograph into evidence will not be overturned on appeal absent a clear showing of an abuse of discretion." *Vann*, 976 S.W.2d at 103 (citations omitted). "A trial court abuses its discretion when it applies an incorrect legal standard, reaches a conclusion that is not logical, bases its decision on a clearly erroneous assessment of the evidence, or uses reasoning that causes an injustice to the complaining party." *Davidson*, 509 S.W.3d at 198 (citations omitted).

Prior to trial, Defendant challenged the admission of photographs taken of the victim during her hospitalization on grounds that they were unduly prejudicial. Doctor Wilt testified at the pretrial hearing on the motion that the photographs were necessary for his testimony and to present a full picture of the victim's physical condition. The trial court admitted the photographs, concluding that they were not so graphic as to be unduly prejudicial. The record supports this conclusion.

Defendant does not challenge the relevance of the photographs, and the record demonstrates that their probative value was high. Defendant was charged with aggravated child neglect and child abuse for the injuries inflicted on the victim. The photographs admitted at trial provided a visual depiction of those injuries. In particular, the photographs conveyed the victim's emaciated state in a way that could not be captured by mere testimony. Moreover, both Doctor Wilt and Ms. Kiser used the photographs during their testimony to explain the victim's injuries to the jury. Although unpleasant, the photographs are not gruesome. Certainly, they are not so graphic or horrifying as to be classified as unduly prejudicial. Moreover, the handful of photographs could hardly be classified as voluminous, and, given that Doctor Wilt explained that each image was necessary to convey specific injuries, they were not cumulative. The trial court did not abuse its discretion by admitting the photographs.

## II. Character Evidence

Defendant asserts for the first time on appeal that the trial court erred by permitting the State to cross-examine Defendant with the underlying details of her prior criminal convictions in violation of Tennessee Rule of Evidence 404(b). The State asserts that Defendant has waived plenary consideration of this issue, that her reliance on Rule 404(b) is inapt, that the alleged improprieties outlined in Defendant's brief "simply did not happen as alleged," and that, in any event, Defendant cannot establish that the trial court abused its discretion.

Prior to trial, Defendant did not contest the admission of her prior convictions for crimes of dishonesty pursuant to Tennessee Rule of Evidence 609. Defendant was asked about two of the convictions during direct examination and about a third during cross-

examination.[5] Defendant did not object to any of the State's questions about her prior convictions, did not raise the issue in her written motion for new trial, and did not raise the issue at the hearing on her motion for new trial.

"Appellate review generally is limited to issues that a party properly preserves for review by raising the issues in the trial court and on appeal." *State v. Minor*, 546 S.W.3d 59, 65 (Tenn. 2018) (first citing Tenn. R. Crim. P. 51; and then Tenn. R. Evid. 103(a)-(b); and then Tenn. R. App. P. 3(e); 13(b), 27(a)(4), 36(a); and then *State v. Bledsoe*, 226 S.W.3d 349, 353-54 (Tenn. 2007)). "Issue-preservation requirements promote efficiency and judicial economy by 'enabl[ing] a trial court to avoid or rectify an error before a judgment becomes final' and 'fostering the expeditious avoidance or correction of errors before their full impact is realized.'" *State v. Bristol*, 654 S.W.3d 917, 926 (Tenn. 2022) (first quoting *Minor*, 546 S.W.3d at 65; and then *State v. Vance*, 596 S.W.3d 229, 253 (Tenn. 2020)).

Issue preservation begins with "a timely and specific objection in the trial court either at or before trial." *State v. Reynolds*, 635 S.W.3d 893, 926 (Tenn. 2021) (first citing Tenn. R. Evid. 103(a); and then *Vance*, 596 S.W.3d at 253). Defendant's claim fails at this first step because she did not, at any point, challenge the admission or use of her prior convictions at trial on any basis, including Rule 404(b). This deprived the trial court of the opportunity "to rule on the admissibility of the evidence before it [was] introduced to the jury." *State v. McDowell*, No. E2020-01641-CCA-R3-CD, 2022 WL 1115577, at *17 (Tenn. Crim. App. Apr. 14, 2022) (citation omitted).

The second step in issue preservation requires presenting "the issue in a motion for a new trial." *Reynolds*, 635 S.W.3d at 926 (first citing Tenn. R. App. P. 3(e)); and then *State v. Harbison*, 539 S.W.3d 149, 164 (Tenn. 2018)). "In a motion for new trial, the defendant must set forth the factual grounds on which he relies, the legal grounds for the trial court's ruling, and a concise statement as to why the trial court's decision was in error." *Id.* (quoting *Harbison*, 539 S.W.3d at 164-65). When crafting argument in a motion for new trial, a defendant should not "simply allege, in general terms, that the trial court committed error, either by taking some action or by admitting or excluding evidence" but should "identify the specific circumstances giving rise to the alleged error so that it may be reasonably identified in the context of the entire trial." *Fahey v. Eldridge*, 46 S.W.3d 138, 142-43 (Tenn. 2001) (citing *State v. Ashburn*, 914 S.W.2d 108, 114 (Tenn. Crim. App. 1995)). Here, too, Defendant's claim fails. She alleged only that the trial court's "entry of 404(b) evidence was more prejudicial than probative" without identifying either the allegedly objectionable evidence or the circumstances of its admission. When given the opportunity to clarify the claim at the hearing, Defendant said that the claim related to the emails that she purportedly sent to organizations to obtain help for the victim. And contrary to her assertions in her brief, she did not raise any claim about the admission or use of her

---

[5] In her brief, Defendant quotes material from a pretrial motion hearing and argues as though the State asked inappropriate questions at trial. Contrary to Defendant's assertions, the record shows the State did not question Defendant about the underlying circumstances of any of her convictions at trial.

27

prior convictions in her motion for new trial. Consequently, this claim is waived. *Harbison*, 539 S.W.3d at 164 ("Grounds not raised in a motion for new trial are waived for purposes of appeal.")

Whether properly assigned or not, however, this court may review an issue for plain error. *See* Tenn. R. App. P. 36(b) ("When necessary to do substantial justice, an appellate court may consider an error that has affected the substantial rights of a party at any time, even though the error was not raised in the motion for a new trial or assigned as error on appeal."). Defendant has not asked this court to exercise our discretion to undertake plain error review of this issue, even after she was alerted to the waiver by the State's brief. As the appellant, Defendant bears the burden of establishing entitlement to plain error review. *See, e.g.*, *Reynolds*, 635 S.W.3d at 931 (Tenn. 2021) (citation omitted). The first and best way to obtain plain error review is to ask for it. *See State v. Thompson*, No. W2022-01535-CCA-R3-CD, 2023 WL 4552193, at *5 (Tenn. Crim. App. July 14, 2023) ("Because the '[d]efendant bears the burden of persuasion to show that he is entitled to plain error relief,' a defendant's failure to request this relief weighs against any such consideration on our own." (first quoting *State v. Dixon,* No. M2021-01326-CCA-R3-CD, 2022 WL 5239289, at *21 (Tenn. Crim. App. Oct. 6, 2022); and then citing *State v. Cornwell,* No. E2011-00248-CCA-R3-CD, 2012 WL 5304149, at *18 (Tenn. Crim. App. Oct. 25, 2012))) (alteration in *Thompson*). At the very least, Defendant should have responded to the State's assertion of waiver. *Thompson*, 2023 WL 4552193, at *5 ("Where a defendant fails to respond to a waiver argument, only particularly compelling or egregious circumstances could typically justify our *sua sponte* consideration of plain error relief." (citing *State v. Powell*, No. W2011-02685-CCAR3-CD, 2013 WL 12185202, at *8 (Tenn. Crim. App. Apr. 26, 2013))). Because the record does not demonstrate the existence of circumstances that are "particularly compelling or egregious," we decline to consider this issue any further.

## III. Facebook Messages

Defendant contends that the trial court erred by excluding the printed screenshots that she purportedly captured from Facebook Messenger, arguing that they were authenticated by Defendant and admissible pursuant to hearsay exceptions as statements against interest or a present sense impression. She also argues for the first time on appeal that the exclusion of this evidence violated her constitutional right to present a defense. The State avers that the trial court did not abuse its discretion by finding that Defendant failed to authenticate the messages and that Defendant waived her constitutional claim by failing to present it below.

To secure admission of the messages, Defendant had to establish that they were relevant, that they were authentic, and, because they were out of court statements, and that they were not barred by the rule against hearsay.

## A. Relevance

The State does not challenge the relevance of the evidence, and the record establishes that the trial court did not abuse its discretion by finding that messages from the victim saying that she fabricated her allegations would be relevant if they were also authentic and admissible via an exception to the rule against hearsay. *See State v. DuBose*, 953 S.W.2d 649, 652 (Tenn. 1997) (stating that the appellate court reviews the trial court's ruling on questions of evidentiary relevance for an abuse of discretion).

## B. Authentication

"The requirement of authentication or identification as a condition precedent to admissibility is satisfied by evidence sufficient to the court to support a finding by the trier of fact that the matter in question is what its proponent claims." Tenn. R. Evid. 901(a). The purpose of the rule is "to insure 'that there has been no tampering, loss, substitution, or mistake with respect to the evidence.'" *State v. Cannon*, 254 S.W.3d 287, 296 (Tenn. 2008) (quoting *State v. Scott,* 33 S.W.3d 746, 752 (Tenn. 2000). The trial court is the "arbiter of authentication issues," and, in consequence, we review this issue to determine whether that court clearly abused its discretion. *See* Tenn. R. Evid. 901, Advisory Comm'n Cmt.; *State v. Mickens*, 123 S.W.3d 355, 376 (Tenn. Crim. App. 2003); *State v. Holmes*, No. E2021-01489-CCA-R3-CD, 2022 WL 16736968, at *10 (Tenn. Crim. App. Nov. 7, 2022).

Here, contrary to the State's assertion, the trial court stopped short of ruling that Defendant had or had not authenticated the messages and said only that she "could" potentially authenticate them. *See* Tenn. R. Evid. 901(b)(1) (stated that the testimony of a witness with knowledge "that a matter is what it is claimed to be" generally satisfies authentication requirements). The trial court did express concerns about the reliability of the messages, although it couched its concerns in terms of the rule against hearsay. The trial court also accredited evidence that Defendant created the account for the victim, that the victim did not "have access to this Facebook account," and that the victim denied sending the messages. These findings suggest that the trial court was not convinced that the messages were authentic. Even in the absence of a definitive ruling on the authenticity of the messages, we conclude that the trial court implicitly concluded that Defendant failed to satisfy authentication requirements, a ruling that the trial court stated more clearly at the hearing on the motion for new trial. There, the court stated that despite being given "every opportunity" to establish that the messages were authentic, Defendant failed to "prove[] up" the authenticity of the messages. The court noted that the messages as offered by Defendant were "literally no different" than simply typing a message, printing it, bringing it to court, and attributing it to another person. The court added that the proof showed that the victim had been "pulled out of school, had little to no access to any electronics, [and] had accounts created for her."

The trial court did not abuse its discretion by excluding the messages. Although Defendant claimed that the printouts were screenshots of Facebook messages with the victim, nothing in the print outs themselves corroborates this description. Moreover, Defendant acknowledged that she logged into the victim's account to retrieve the messages rather than retrieve them from her own account and could not provide a legitimate explanation for why she chose to retrieve the messages this way. She also claimed to have lost access to the original screenshots because she changed cell phones. The victim denied sending the messages and stated that she used the Facebook account created for her by Defendant only once, and her testimony was corroborated by evidence that subpoenas to Facebook failed to return the messages or any information corroborating the conversations.

## C. Hearsay

Even if the trial court abused its discretion by concluding that Defendant failed to authenticate the messages, the court did not err by concluding that the messages were inadmissible hearsay.

"'Hearsay' is a statement, other than one made by the declarant while testifying at the trial or hearing, offered in evidence to prove the truth of the matter asserted." Tenn. R. Evid. 801(c). "Hearsay is not admissible except as provided by these rules or otherwise by law." *Id.* 802. Tennessee Rules of Evidence 803 and 804 provide exceptions to the general rule excluding hearsay. *See generally* Tenn. R. Evid. 803, 804.

Our supreme court has confirmed that "[t]he standard of review for rulings on hearsay evidence has multiple layers." *Kendrick v. State*, 454 S.W.3d 450, 479 (Tenn. 2015). The "factual and credibility findings" made by the trial court when considering whether a statement is hearsay "are binding on a reviewing court unless the evidence in the record preponderates against them." *Id.* (citing *State v. Gilley*, 297 S.W.3d 739, 759-61 (Tenn. Crim. App. 2008)). "Once the trial court has made its factual findings, the next questions—whether the facts prove that the statement (1) was hearsay and (2) fits under one [of] the exceptions to the hearsay rule—are questions of law subject to de novo review." *Id*. (citing *State v. Schiefelbein*, 230 S.W.3d 88, 128 (Tenn. Crim. App. 2007); *Keisling v. Keisling*, 196 S.W.3d 703, 721 (Tenn. Ct. App. 2005)); *see also Gilley*, 297 S.W.3d at 760 (stating that because "[n]o factual issue attends" the trial court's determination whether a statement is hearsay, "it necessarily is a question of law"). "If a statement is hearsay, but does not fit one of the exceptions, it is inadmissible, and the court must exclude the statement. But if a hearsay statement does fit under one of the exceptions, the trial court may not use the hearsay rule to suppress the statement." *Kendrick*, 454 S.W.3d at 479; *see also Gilley*, 297 S.W.3d at 760-61.

### 1. Statements Against Interest

Defendant argues that the Facebook messages were admissible as statements against interest, but this claim is quickly defeated because the victim was not unavailable at trial.

Tenn. R. Evid. 804 (defining statements against interest as admissible "if the declarant is unavailable as a witness"). Defendant suggests that the courts of this state have admitted statements against interest "even if the declarant testifies" but cites no authority for this proposition. *See* Tenn. Ct. Crim. App. R. 10(b) ("Issues which are not supported by argument, citation to authorities, or appropriate references to the record will be treated as waived in this court."); *see also* Tenn. R. App. P. 27 (a)(7)(A) (stating that the argument section of the appellant's brief must contain "citations to the authorities" supporting the "contentions of the appellant with respect to the issues presented").

## 2. Present Sense Impression

Citing Tennessee Rule of Evidence 803(1), Defendant also claims that the messages were admissible as present sense impressions. Again, this claim is quickly defeated because, unlike the Federal Rules of Evidence, the Tennessee Rules of Evidence "contain no present sense impression exception." Tenn. R. Evid. 803(1), Advisory Comm'n Cmt; *see State v. Waggoner*, No. E2018-01065-CCA-R3-CD, 2019 WL 4635589, at *22 (Tenn. Crim. App. Sept. 24, 2019) (citing *State v. Carpenter*, 773 S.W.2d 1, 9 (Tenn. 1989); Neil P. Cohen, et al., *Tennessee Law of Evidence* § 8.07[9] (6th ed. 2011)). Indeed, Evidence Rule 803(1) is specifically reserved. *See* Tenn. R. Evid. 803(1).

## *D. Right to Present a Defense*

Defendant claims for the first time on appeal that the exclusion of the messages violated her constitutional right to present a defense. *See State v. Dobbins*, 754 S.W.2d 637, 641 (Tenn. Crim. App. 1988) (stating "that a party may not take one position regarding an issue in the trial court, change his strategy or position in mid-stream, and advocate a different ground" on appeal). Again, Defendant has waived our consideration of this issue. *See Minor*, 546 S.W.3d 5 at 65; *Reynolds*, 635 S.W.3d at 926-27. Defendant did not ask this court to review the issue for plain error, even after she was alerted to the waiver by the State's brief, and, particularly given that her claim is made only in passing with little argument or authority to support it, we find no compelling reason to undertake plain error review. *See Thompson*, 2023 WL 4552193, at *5.

## IV. Sufficiency of the Evidence

Defendant asserts that the evidence was insufficient to support her convictions, arguing primarily that the State failed to establish that she acted knowingly with respect to any of the conviction offenses. The State contends that the evidence was sufficient to support all of Defendant's convictions.

We review a challenge to the sufficiency of the convicting evidence to determine whether, "after viewing the evidence in the light most favorable to the prosecution" and providing the State with "the strongest legitimate view of the evidence as well as all reasonable and legitimate inferences which may be drawn therefrom," "*any* rational trier

of fact could have found the essential elements of the crime beyond a reasonable doubt." *Jackson v. Virginia*, 443 U.S. 307, 319 (1979) (citations omitted); *State v. Davis*, 354 S.W.3d 718, 729 (Tenn. 2011) (citations omitted); Tenn. R. App. P. 13. Our review "is identical whether the conviction is predicated on direct or circumstantial evidence, or a combination of both." *State v. Williams*, 558 S.W.3d 633, 638 (Tenn. 2018) (citing *State v. Dorantes*, 331 S.W.3d 370, 379 (Tenn. 2011)). Importantly, a guilty verdict removes the presumption of innocence and replaces it with one of guilt on appeal, shifting the burden to the defendant to demonstrate why the evidence is legally insufficient to support the conviction. *Davis*, 354 S.W.3d at 729 (citing *State v. Sisk*, 343 S.W.3d 60, 65 (Tenn. 2011)).

We must decline any invitation to revisit witness credibility or any purported discrepancies in the evidence because the jury, not this court, resolves all questions involving the credibility of the witnesses, the weight and value to be given to evidence, and the factual disputes raised by such evidence. *See Dorantes*, 331 S.W.3d at 379 (citing *State v. Campbell*, 245 S.W.3d 331, 335 (Tenn. 2008)). Accordingly, this court will neither re-weigh nor reconsider the evidence when evaluating the sufficiency of the convicting proof. *State v. Stephens*, 521 S.W.3d 718, 724 (Tenn. 2017).

## A. Aggravated Child Neglect

As charged in this case, aggravated child neglect is "child neglect, as defined in § 39-15-401(b)" that "results in serious bodily injury to the child." Tenn. Code Ann. § 39-15-402(a)(1). Child neglect, as is relevant here, means to neglect a child "so as to adversely affect the child's health and welfare." *Id*. § 39-15-401(b). Child neglect has "three essential elements: (1) a person knowingly must neglect a child; (2) the child's age must be within the applicable range set forth in the statute; and (3) the neglect must adversely affect the child's health and welfare." *State v. Sherman*, 266 S.W.3d 395, 404 (Tenn. 2008) (first citing *State v. Mateyko,* 53 S.W.3d 666, 670 (Tenn. 2001); and then *State v. Ducker*, 27 S.W.3d 889, 896 (Tenn. 2000)). To obtain a conviction for child neglect, the State must establish "that a defendant owes a legal duty to the child," *id.* (citing *Mateyko,* 53 S.W.3d at 671), and that "the defendant's neglect produced an actual, deleterious effect or harm upon the child's health and welfare," *Mateyko*, 53 S.W.3d 672.

> "Serious bodily injury to the child" includes, but is not limited to, second- or third-degree burns, a fracture of any bone, a concussion, subdural or subarachnoid bleeding, retinal hemorrhage, cerebral edema, brain contusion, injuries to the skin that involve severe bruising or the likelihood of permanent or protracted disfigurement, including those sustained by whipping children with objects and acts of female genital mutilation as defined in § 39-13-110.

Tenn. Code Ann. § 39-15-402(c). We have "held that 'the legislature intended the threshold of injury necessary to establish "serious bodily injury to the child" would be less than that required to establish "serious bodily injury" under the general definition of the criminal code.'" *State v. First*, No. W2024-01823-CCA-R3-CD, 2025 WL 3124684, at *4 (Tenn. Crim. App. Nov. 7, 2025) (quoting *State v. Mark*, No. M2014-00651-CCA-R3-CD, 2015 WL 4720038, at *36 (Tenn. Crim. App. Aug. 10, 2015), *perm. app. denied* (Tenn. Dec. 10, 2015)). As such, the State need not establish that the defendant knew that the neglect would result in serious bodily injury. *State v. Weems*, 619 S.W.3d 208, 224 (Tenn. 2021) (citing *State v. Prater*, 137 S.W.3d 25, 34 (Tenn. Crim. App. 2003)).

Here, the evidence established that Defendant, the live-in romantic partner of the victim's father, exercised parental authority over the victim. The victim was sixteen years old on May 17, 2021. Defendant was present when the victim was removed from Volunteer High and signed paperwork permitting Volunteer High to release the victim's educational records to a homeschool program. The victim said Defendant was supposed to monitor her homeschooling. The victim testified that she viewed Defendant as a parental figure and that she was required to obey Defendant or face punishment, saying she "couldn't do anything unless I was given permission" by Defendant. Defendant stayed home with the victim and the other children while the victim's father and Mr. Perkins worked outside the home. Given the victim's age and the role that Defendant played in the victim's life, the evidence sufficiently established that Defendant stood *in loco parentis* and, therefore, owed a legal duty to the victim. *See Sherman*, 266 S.W.3d at 407 (explaining that intent to assume parental duties can be inferred from circumstantial evidence including "the child's age, the child's dependence upon the person claimed to be *in loco parentis*, and whether that person supports the child and exercises the duties and obligations of a natural parent") (citation omitted).

Defendant placed the victim on a strict schedule, setting timers to remind the victim to do chores and only allowing periodic restroom visits. Defendant restricted the victim's access to food, forbade her from entering the kitchen, and only occasionally permitted the victim to eat meager, processed food that was not even heated while the rest of the family ate "[t]ypical food." The victim said she did not dare get up and go get her own food for fear that she would "get beat." Defendant forced the victim to drink excessive amounts of water and forced her to exercise as punishment when she failed to perform her chores to Defendant's "and everybody else's standards," if she "got up to use the bathroom" without permission, or if she "didn't finish [her] water by a certain time." As a result, the victim was extremely malnourished when she was taken from the home she shared with Defendant. Chief Deputy Allen stated that when he first saw the victim under the bed inside the house, he thought she was a skeleton. Doctor Wilt and Ms. Kiser described the victim's condition as the worst case of malnourishment that they had ever seen. She had suffered severe muscle wasting all over her body. Photographs of the victim verified the testimony that she was emaciated. The victim suffered refeeding syndrome, a metabolic disorder caused by her sudden access to nutrition after having been deprived for so long,

33

which could have led to her death. Additionally, when she entered the hospital, the victim had "orthostatic intolerance," which meant that "she was unsteady on her feet even just getting up from the bed" and that she required assistance from the nursing staff even "to use the restroom . . . in the room."

Further, contrary to Defendant's assertions, both Doctor Wilt and Ms. Kiser explained that no underlying physical condition accounted for the victim's severely malnourished state. In fact, while she was in the hospital being provided with appropriate nutrition, the victim gained a significant amount of weight. She continued to gain weight after leaving the hospital, and she had maintained a healthy weight for more than a year at the time of trial. Although Defendant attempted to blame the victim's loss of more than twenty percent of her weight on an eating disorder, both Doctor Wilt and Ms. Kiser explained that the victim did not display any signs of suffering from an eating disorder and that she was a "robust" eater. Her foster mother confirmed this. Importantly, Doctor Wilt and Ms. Kiser testified, and Defendant acknowledged, that the victim was at serious risk of death when she was initially admitted into the hospital. Most of her major muscles had wasted away. Stated bluntly, the victim nearly starved to death at the hands of Defendant and the other adults in the home. Despite the victim's extremely emaciated appearance, Defendant did not seek medical help for the victim. The victim said that before being removed from the home, she had not visited the doctor in more than two years. She had not had a regular menstrual cycle for more than six months, and Defendant refused to provide her with feminine hygiene products.

Additionally, the victim's back was covered in bruises from Defendant's forcing her to sit with her back against cat litter bottles for hours on end inside the family's trailer, which was itself filthy and riddled with animal feces. Her head had been partially shaved, and she was filthy, which the victim explained was because she was only occasionally allowed to bathe and had only a single basket of clothing that was never laundered. This evidence was sufficient to support Defendant's conviction of aggravated child neglect. *See Weems*, 619 S.W.3d at 210 (affirming convictions of aggravated child neglect and reckless homicide when infant victim died from dehydration and malnutrition); *State v. Mathis*, No. M2009-00123-CCA-R3-CD, 2012 WL 4461767, at *29 (Tenn. Crim. App. Sept. 26, 2012) (affirming conviction of felony murder by aggravated child neglect and aggravated child neglect when evidence established that withholding of nourishment caused victim to suffer "'nonorganic malnutrition at the time of her death'").

### B. Child Abuse

A person commits the offense of child abuse when the person "knowingly, other than by accidental means, treats a child under eighteen (18) years of age in such a manner as to inflict injury." Tenn. Code Ann. 39-15-401(a). Injury "includes a cut, abrasion, bruise, burn or disfigurement, and physical pain or temporary illness or impairment of the function of a bodily member, organ, or mental faculty." Tenn. Code Ann. § 39-11-106(3).

34

As in the case of aggravated child neglect, the State need not establish that the defendant knew that the conduct would result in injury. *See Prater*, 137 S.W.3d at 34.

The evidence in this case established that Defendant struck the victim with her fists and with a variety of objects, resulting in severe bruising and the loss of her front tooth. Corporal Crosby testified that the victim "looked like someone who'd come out of a prisoner-of-war camp. I mean just very frail. I remember she had a black eye. Her hair was cut off." Although Defendant claims that she "presented a compelling alternative explanation" for the victim's condition, including the bruising on her face, back, and legs and her missing tooth, the jury, as was its prerogative, rejected Defendant's explanation and chose to accredit the victim's testimony that she received the injuries as a result of Defendant's knowing conduct. This evidence was sufficient to support Defendant's conviction of child abuse.

## C. False Report

As is relevant here, Tennessee Code Annotated section 39-16-502 makes it a crime to respond "to a legitimate inquiry by a law enforcement officer concerning a material fact about an offense or incident within the officer's concern" with a statement or report that the person knows is false "with the intent to obstruct or hinder the officer from . . . [p]reventing the offense or incident from occurring or continuing to occur." Tenn. Code Ann. § 39-16-502(a)(2)(A). The evidence, viewed in the light most favorable to the State, established that when initially questioned by Deputy Johnson, Defendant and the other adults said that the three children Deputy Johnson saw were the only children living in the house. When he and Corporal Crosby returned to the residence, Defendant and the other adults "kept saying they've got aggressive dogs and . . . exotic animals, 'coons and everything. They didn't want to let us in the house." Defendant told deputies that the victim "was not there; she was in Pigeon Forge with her uncle. And they were going to a water park and would be back in two days." Corporal Crosby confirmed Defendant's lies about the victim's whereabouts, saying Defendant "was very adamant that the child was not there." Defendant initially refused entry to Chief Allen, but the chief told Defendant that he "had an obligation and a duty" to check the welfare of the other child. Once officers gained entry to the residence, none of the adults directed officers to the victim. Instead, Chief Allen discovered the victim underneath a bed surrounded by cardboard that was placed to conceal her presence. Thus, Defendant knew that the officers had been called to the residence to check on the victim's welfare and knew that the victim was inside the residence but lied to the officers and told them that the victim was not there. Defendant actively prevented the officers from entering the residence. Defendant's lies about the victim's whereabouts and her efforts to prevent the officers from discovering the victim inside the residence demonstrate a knowing effort to prevent officers from discovering the victim, who Defendant and the others had been abusing and neglecting for months. This evidence was sufficient to support Defendant's conviction of making a false report.

## V. Sentencing

Finally, Defendant challenges the sentencing decision of the trial court, arguing that the trial court "overlook[ed] crucial evidence" when rejecting all mitigating factors and failed to account for her "alleged minor role, her documented mental health conditions, and her purported actions under duress." The State contends that the trial court did not abuse its discretion by imposing the total effective sentence of twenty years, eleven months, and twenty-nine days' incarceration.

We review the length and manner of service of within-range sentences imposed by the trial court under an "abuse of discretion standard with a 'presumption of reasonableness.'" *State v. Bise*, 380 S.W.3d 682, 708 (Tenn. 2012). "A trial court abuses its discretion when it applies incorrect legal standards, reaches an illogical conclusion, bases its ruling on a clearly erroneous assessment of the proof, or applies reasoning that causes an injustice to the complaining party." *State v. Phelps*, 329 S.W.3d 436, 443 (Tenn. 2010). Our supreme court has stated that "the abuse of discretion standard of appellate review accompanied by a presumption of reasonableness applies to all sentencing decisions." *State v. King*, 432 S.W.3d 316, 324 (Tenn. 2014) (citing *State v. Pollard*, 432 S.W.3d 851, 864 (Tenn. 2013)). This standard also applies to "questions related to probation or any other alternative sentence," *State v. Caudle*, 388 S.W.3d 273, 279 (Tenn. 2012), as well as to a trial court's decision to impose consecutive sentencing, *see Pollard*, 432 S.W.3d at 860.

Nevertheless, to be afforded deference on appeal, the trial court must "place on the record any reason for a particular sentence." *Bise*, 380 S.W.3d at 705. There is no presumption of reasonableness when the trial court fails to consider and weigh the applicable factors. *See King*, 432 S.W.3d at 327-28; *Caudle*, 388 S.W.3d at 279.

We will uphold the trial court's sentencing decision on appeal "so long as it is within the appropriate range and the record demonstrates that the sentence is otherwise in compliance with the purposes and principles listed by statute." *Bise*, 380 S.W.3d at 709-10. A defendant bears the burden of proving that the sentence is improper. *See* Tenn. Code Ann. § 40-35-401, Sentencing Comm'n Cmt.; *see also State v. Ashby*, 823 S.W.2d 166, 169 (Tenn. 1991).

As the State correctly points out, Defendant does not challenge any of the factual findings made by the trial court during sentencing and does not assert that the trial court erred by finding that she had an excessive criminal history, that she was a dangerous offender, or that she was on probation at the time of the offenses. Instead, she challenges the weight afforded to these considerations and suggests that her sentence "may not align with the principle of imposing the 'least severe measure necessary.'" Even in her reply brief, Defendant repeats this general challenge to her sentence. She claims that the trial court made findings that "were unsubstantiated or overly broad" without identifying any

of the court's findings with particularity. She claims that the court should not have concluded that she was a professional criminal because her prior offenses were property crimes but does not cite any authorities to support this assertion. She claims that the trial court improperly rejected all the mitigating factors but does not cite any authorities to support her assertion. To grant Defendant relief based on her vague claims of error would require this court to construct Defendant's arguments for her and then comb the record for facts to support them. This we cannot do.

In our view, Defendant has waived plenary review of her challenge to the sentence imposed in this case by failing to articulate why she believes the trial court erred and by failing to support her claims with citation to appropriate authorities. *See* Tenn. R. App. P. 27 (stating that the appellant's brief should state "the contentions of the appellant with respect to the issues presented, and the reasons therefor, including the reasons why the contentions require appellate relief, with citations to the authorities"); *see* Tenn. Ct. Crim. App. P. 10(b) ("Issues which are not supported by argument, citation to authorities, or appropriate references to the record will be treated as waived in this court.").

## Conclusion

Based upon the foregoing, we affirm the judgments of the trial court.

s/ Matthew J. Wilson
MATTHEW J. WILSON, JUDGE
